# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# EASTERN  DIVISION

JUDY BROOME,                    )
                                )
    Plaintiff(s),               )
                                )
vs.                             )    CV-98-N-2165-E
                                )
SUPERVALU, INC.,                )
                                )
    Defendant(s).               )

**ENTERED**

MAR 2 6 2001

## Memorandum of Opinion

## I.    Introduction

The plaintiff, Judy Broome ("Broome"), alleges that her former employer, defendant SuperValu Inc., violated the provisions of Title VII of the Civil Rights Act of 1964, as amended, by paying her less money, denying her a salary adjustment, and giving her less favorable job assignments than similarly situated male employees. Broome further alleges that she was unlawfully retaliated against and constructively discharged for pursuing her claims of discrimination.

This matter is presently before the court on SuperValu's motion for summary judgment, filed on May 15, 2000 (Doc. # 50), and Broome's motion to strike the declaration of Fred Brooks, filed on June 22, 2000 (Doc. No. # 57). After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that the motion to strike is due to be **DENIED** and the motion for summary judgment is due to be **GRANTED** in all respects.



## II. Motion to Strike

As a preliminary matter, the Court must consider Broome's motion to strike portions of the declaration of Fred Brooks ("Brooks"), done on May 12, 2000, for lack of first hand knowledge. *See* Fed. R. Civ. P. 56(e). Rule 56(e) of the Federal Rules of Civil Procedure requires that "affidavits" that support or oppose summary judgment motions "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Id.*

In his affidavit, Brooks indicates that he is Director of Human Resources for SuperValu's Anniston, Alabama, office. (Def. Ex. 2, Brooks Dec.). Brooks further states:

> In my role as Director of Human Resources, I am responsible for the administration of all personnel functions including the maintenance of employee profiles and application of the Hay Point Ratings System for exempt personnel and compensation systems for non-exempt personnel. Employee profiles and other personnel documents categorized by employee name and type are maintained in my department. I am familiar with the historical information regarding employee compensation, tenure, experience, and, as such, am familiar with all claims asserted in this lawsuit. An individual's "Employee Profile" contains all pertinent official data regarding that employee's employment. The profile reflects salary increases, pay ranges, midpoints, job title changes, promotions, demotions, and other similar changes in an employee's employment record.

(Def. Ex. 2, Brooks Dec.). Upon thorough examination of the paragraphs challenged by the plaintiff, the court is convinced that Brooks, as custodian of defendant's official records, has the requisite personnel knowledge of the information contained in the records and, therefore, is the individual best positioned to present such information to the court.

2

Accordingly, Broome's assertion that the affiant lacks requisite first hand knowledge is unsupported and without merit.

To the extent Broome intends to suggest that the assertions contained in Brooks' affidavit are inadmissible hearsay, this contention is also without merit. In *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996), the Eleventh Circuit read the Supreme Court's decision in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), and its own decisions interpreting *Celotex*, "as simply allowing *otherwise admissible* evidence to be submitted in *inadmissible* form at the summary judgment stage, though at trial it must be submitted in admissible form." *Id.* (citing *Offshore v. Transcon Lines, Inc.*, 831 F.2d 1013 (11th Cir. 1987) (emphasis in original). Pursuant to Fed. R. Evid. 803(6), documents or records kept in the normal course of business are competent and admissible so long as the custodian of records "or otherwise qualified witness" can testify to that effect. *See* Fed. R. Civ. P. 803(6). As noted above, Brooks indicates that he is the custodian of employment records at SuperValu's Anniston office, that he is familiar with the documents referenced in and/or submitted along with his affidavit, and that such documents are kept in the normal course of SuperValu's business. For this reason, the court finds that Brooks' affidavit meets the requirements of Fed. R. Civ. P. 56(e) and Fed. R. Evid. 803(6) and, therefore, the statements contained therein are either admissible or could be reduced to admissible form at trial. Accordingly, the motion to strike will be denied.

## III.    Statement of Facts[1]

The facts, as garnered from the affidavits and deposition testimony submitted by the parties but viewed in a light most favorable to the plaintiff, are as follows:

Ms. Broome, a white female, began working for SuperValu, a whole-sale distributer of grocery products, in October of 1973 (Def. Ex. 11, Bates #'s D-1389 - D-1390). She was hired as an accounting clerk and retained that position until November of 1979, when she transferred to the position of secretary. (*Id.*, Bates #'s D-1352 - D-1353). Broome was promoted to Inventory Control Supervisor ("ICS"), a salaried, exempt position,[2] in December of 1984. (*Id.*). At the time Broome was promoted to ICS, two SuperValu employees, Chuck Mangham ("Mangham") and Ann Doyle ("Doyle"), held comparable supervisory positions. (Def. Ex. 5, Broome Depo. at p. 159). Since Mangham and Doyle had been performing supervisory duties since 1976 and 1977, respectively, both individuals received higher salaries under the Hay system than did Broome. (Def. Ex. 2, Brooks Dec. at ¶ 6). In fact, Doyle, a female, was the highest paid inventory control supervisor. (*Id.*). Mangham died in a car wreck in 1991, and Hershel Barker ("Barker") transferred from a Warehouse Supervisor position to fill the vacant ICS position. (*Id.*; Def. Ex. 5, Broome Depo. at p. 161). Although Barker transferred to ICS several years after Broome was promoted to

---

[1] In developing the statement of facts in this opinion, the court considered the facts proposed by the parties and the court's own examination of the evidentiary record. These are the "facts" for purposes of this opinion only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied, USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

[2] The salaries of all exempt employees are determined through application of the "Hay Point Rating System," an objective pay scale discussed in further detail *infra.*

4

that same position, Barker's salary exceeded that of Broome's. (Def. Ex. 2, Brooks Dec. at ¶ 7).

In late 1996, Howard White ("White"), the acting Director of Distribution, decided that management of SuperValu's Reclamation Center, a facility designed to handle the "reclamation" of damaged goods, would be transferred from the warehouse division to the inventory control division. (Def. Ex. 6, Cooper Depo. at p. 28; Plf. Ex. 8, Green Depo. at p. 50). White advised Jody Cooper ("Cooper"), the inventory control manager, as well as Barker and Broome, that they would rotate as managers of the Reclamation Center. (Def. Ex. 6, Cooper Depo. at pp. 47-48; Def Ex. 10, Barker Depo. at p. 48). Broome was ultimately selected to perform the first one-year rotation and commenced management of the Reclamation Center in December of 1996. When management of the Reclamation Center was turned over to Broome, she earned approximately $34,059.00 per year. (Def. Ex. 2, Brooks Dec. at ¶ 10; Def. Ex. 11, Bates # D-1168). Her predecessor, Steve Green ("Green"), a Warehouse Supervisor, earned approximately $48,081.00 per year. (Def. Ex. 2, Brooks Dec. at ¶ 9 (Ex. C, p. 7)).

In March of 1996, Mike Woodward ("Woodward") replaced White as the Director of Distribution. (Def. Ex. 4, Woodward Depo. at p. 6). Soon thereafter, in examining the functioning and staffing of the inventory control department, the volume of work, responsibility, and comparison with other divisions, Woodward determined that the inventory control supervision position was not necessary to the extent the supervisors' jobs were largely clerical and there were no direct reports. (Id. at pp. 83-87). Based on these findings, Woodward decided to phase out all ICS positions and have the work performed

5

by non-exempt, non-supervisory, hourly clerks. (Id.) Woodward then informed Cooper, the inventory control manager, that the company would not fill ICS positions as they came open. (Id.). In April of 1997, a permanent Inventory Control Clerk's position was posted, and Earl Fagen ("Fagen") received that job. (Id. at pp. 77-81, 86-87).

In May of 1997, Woodward began analyzing the effectiveness of the reclamation facility and whether the facility should be closed or its functions outsourced. (Def. Ex. 6, Woodward Depo. at p. 62-66). According to SuperValu, the Reclamation Center was losing business under the supervision of both Green and Broome. By September of 1997, Woodward made the decision to close the Reclamation Center and outsource that work. (Id. at pp. 63, 89). At the time of Woodward's decision, Broome was still assigned to the Reclamation Center. (Id. at pp. 62, 89). In September of 1997, Woodward and Jay Lux ("Lux"), the former Human Resources Director, met with Broome and discussed the closing of the Reclamation Center and how this would effect her position. (Id. at p. 91; Def. Ex. 5, Broome Depo. at p. 244).

Although Broome was given the opportunity to become a Warehouse Supervisor, she expressed her desire to move back into the inventory control department as a supervisor. (Def. Ex. 6, Woodward Depo. at pp. 89, 91-92; Plf. Ex. 1, Broome Depo. pp. 229-230, 241, 245). During their conversation, Broome informed Woodward, for the first time, that the Reclamation Center assignment was to have been rotated among the inventory control supervisors. (Def. Ex. 6, Woodward Depo. at p. 89; Plf. Ex. 1, Broome Depo. at pp. 241). Broome proposed that SuperValu "bump" Barker out of the remaining ICS position so that she could return to that department. (Plf. Ex. 1, Broome Depo. at p. 241). Woodward

6

informed Broome that SuperValu does not envision the bumping of supervisors and, since supervisory positions within the inventory control department were to be eliminated, he envisioned no long term growth opportunities for employees assigned to ICS. (Def. Ex. 6, Woodward Depo. at pp. 91, 157). In fact, Doyle, the most senior ICS, had retired in 1996 and Barker was subsequently terminated in 1997. (*Id.* at p. 157). Consistent with Woodward's decision not to fill the ICS vacancies, including Broome's position, the vacancies created by the absences of Doyle and Barker were never filled. (*Id.*).

In September of 1997, when Lux and Woodward initially discussed Broome's potential move to a supervisory position in the warehouse, they did not intend to adjust her pay because her ICS salary of approximately $34,000.00 was sufficiently near the midpoint of a Warehouse Supervisor position (Hay midpoint $36,658.00). (*Id.* at p. 165; Def. Ex. 9, Lux Depo. pp. 83-85; Def. Ex. 2, Brook Dec. at ¶ 13). However, upon further discussion, Woodward and Lux recalculated Broome's pay, resulting in a 10% increase to $37,465 and placing her at 99% percent of the Hay midpoint. (Def. Ex. 2, Brooks Dec. at ¶ 13; Def. Ex. 11, Bates #'s D-1167 - D-1168). The pay increase went into effect during her annual review in December 1997, but was made retroactive to the date she transferred to the warehouse division in September of 1997. (*Id.*). Roughly one-third of the Warehouse Supervisors were paid approximately the same or less than Broome. (Def. Ex. 2, Brooks Dec. at ¶ 14).

In February of 1999, SuperValu announced that, at the beginning of the following month, all Warehouse Supervisors were to rotate shifts. (Plf. Ex. 1, Broome Depo. at pp. 103-04, 106-08). According to SuperValu, Warehouse Supervisor positions are routinely rotated approximately every one and one-half to two years. (Def. Ex. 6, Woodward Depo.

7

at p. 193). As the warehouse runs 24 hours a day, it is necessary to have supervisors working the night shift. (Def. Ex. 2, Brooks Dec. at ¶ 19). Broome was informed that she was being rotated to the night shift. (Plf. Ex. 1, Broome Depo. at pp. 103-04, 106-08). Following the announcement of the rotation, Broome's treating physician, Dr. Ann Groover, forwarded SuperValu a letter which stated that working nights "would be severely detrimental to her emotional stability." (Def. Ex. 11, Bates # D-1151). Fred Brooks ("Brooks"), Director of Human Resources for SuperValu, requested further information regarding Broome's need for accommodations. (Def. Ex. 2, Brooks Dec. at ¶ 19). SuperValu's responsive letter was never answered. (*Id.*). On March 15, 1999, before ever working on the night shift, Broome resigned. (Def. Ex. 11, Bates # 1147).

Broome filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on February 26, 1998, detailing alleged instances of wage disparity, denial of salary adjustments, and less favorable job assignments as compared to similarly situated male employees. On May 27, 1998, the EEOC sent Broome her Notice of Right to Sue. She commenced this action on August 26, 1998, seeking redress pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII").

## IV.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party

8

asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

9

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 746 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility

10

determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## V.    Discussion

### A.    Disparate Pay

Broome maintains that SuperValu discriminated against her by paying her less than similarly situated male employees for doing substantially the same work. In response, SuperValu contends that Broome's claims are partially barred by the statute of limitations and, to the extent her claims are timely, she simply cannot establish pretext. Each of these contentions will be addressed in turn.

### 1.    Timeliness

As an initial matter, SuperValu argues that a portion of Broome's disparate pay claims should be dismissed as untimely. Under Title VII, a plaintiff must file a charge of discrimination within 180 days of the actions alleged to be discriminatory, or the plaintiff is barred from bringing a lawsuit based on those actions. 42 U.S.C. § 2000e-5(e); *Thomas v. Kroger Co.*, 24 F.3d 147, 150 (11th Cir. 1994). The purpose of the requirement that a plaintiff file an EEOC charge within 180 days of the allegedly illegal act or practice is (1) to give the employer prompt notice of the complaint against it, and (2) to give the EEOC sufficient time to attempt the conciliation process before a civil action is filed. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1103 (11th Cir. 1996).

11

Broome filed a charge of discrimination on February 26, 1998. The date 180 days prior to February 26, 1998, is August 30, 1997. Accordingly, any cause of action based upon actions alleged to be discriminatory that occurred before August 30, 1997, is barred as untimely. Under the foregoing time-line, SuperValu maintains that Broome's allegations of disparate pay, with the exception of those claims pertaining to her most recent position as Warehouse Supervisor, are untimely. Broome, however, takes the position that these claims are timely under the "continuing violation" doctrine.

In *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241 (5th Cir. 1980),[3] the former Fifth Circuit set forth the standard for determining whether an employment practice constitutes a "continuing violation." The *Gonzalez* court held:

> A past act of discrimination for which a party did not file a charge of discrimination with the EEOC within the limitations period is legally equivalent to a discriminatory act that occurred before the enactment of Title VII. Although such a past discriminatory act may continue to affect an employee's present pay and fringe benefits, such an effect does not constitute a continuing violation of Title VII . . . [T]he critical question is whether any present violation exists . . . [W]here the employer engaged in a discrete act of discrimination [outside the limitations period], allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the [statute of limitations].

*Gonzalez*, 610 F.2d at 249. Therefore, in determining the applicability of the continuing violation doctrine, the court must distinguish "between the present consequence of a one time violation, which does not extend the limitations period, and the continuation of that

_____

[3] In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

12

violation into the present, which does." *Thigpen v. Bibb County*, 216 F.3d 1314, 1326 (11th Cir. 2000) (quoting *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993)).

As suggested by the Eleventh Circuit in *Knight v. Columbus*, 19 F.3d 579, 582 (11th Cir. 1994), use of the term "continuing violation" in the present context "is something of a misnomer." In disparate pay cases, rather than a single on-going violation, the employee is subject to a series of similar but separate violations. *Id.* "Because each violation gives rise to a new cause of action, each . . . [violation] begins a new statute of limitations period as to that particular event." *Id.*; *see Bazemore v. Friday*, 478 U.S. 385, 395, 106 S. Ct. 3000, 3006, 92 L. Ed. 2d 315 (1986) ("Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII . . ."); *Calloway*, 986 F.2d at 449 (holding race based, discriminatory wage payments constitute a continuing violation . . ."); *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 796-97 (11th Cir. 1992) (holding that each week company denied insurance coverage to divorced men's nonresident children comprised a separate wrong actionable under Title VII). In such circumstances, even though the original discriminatory decision occurred outside the limitations period, the charge is timely with respect to those violations that occurred within the 180 day window, but untimely with respect to any prior violations. *Knight*, 19 F.3d at 582-83; *see Beavers*, 975 F.2d at 796.

Broome maintains that, while occupying the posts of ICS and Reclamation Center Manager,[4] she was paid less money than her male counterparts. This type of alleged violation is virtually identical to the "continuing violations" described in *Bazemore*, *Knight*, *Calloway*, and *Beavers*. For this reason, even if SuperValu's initial decision to adopt such an arguably discriminatory policy falls outside of the limitations period, Broome's charge is nevertheless timely with respect to those alleged violations that occurred within the 180 day window. *Id.* at 582-83. The disparities of which Broome complains clearly extend into late September of 1997, and therefore, fall within the August 30, 1997, limitations period. Accordingly, a portion of Broome's allegations of disparate pay are not time barred and will be considered in determining whether she has established a *prima facie* case of discrimination.

## 2. *McDonnell Douglas-Burdine* Framework

If Broome is to prevail on her disparate pay claims, she must submit some proof of her employer's discriminatory motive, that is, some causal link between her gender and the actions of which she complains. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). In a Title VII case, such as this, where the plaintiff relies solely upon circumstantial evidence, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248,

---

[4] SuperValu maintains that when the Reclamation Center was transferred from the Warehouse Division to the Inventory Control Division, Broome did not receive any change in job title or pay for assuming supervision of the Reclamation Center. (Def. Ex. 2, Brooks Dec. at ¶ 8). Therefore, the court will assume, for purposes of this discussion, the Broome held that job title of ICS until September of 1997.

253-254 & n. 6, 101 S. Ct. 1089, 1094 & n. 6, 67 L. Ed. 2d 207 & n. 6. "Demonstrating a *prima facie* case is not onerous, it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Lathem v. Department of Children & Youth Servs.*, 172 F.3d 786, 792 (11th Cir. 1999).

Once the plaintiff establishes a *prima facie* case, the burden of production then shifts to the employer to articulate a "legitimate nondiscriminatory reason" for the alleged discriminatory employment action. *Lathem*, 172 F.3d at 793. "To satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1527-28 (11th Cir. 1997), *cert. denied*, ___ U.S. ___, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1997).

Once the employer presents a legitimate nondiscriminatory reason for its action, the presumption of discrimination "drops from the case," *Burdine*, 450 U.S. at 255 n. 10, leaving the elements of the *prima facie* case. *Combs*, 106 F.3d at 1528. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the employer was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. The plaintiff may meet this burden by persuading the fact-finder either directly that a discriminatory reason more than likely motivated the employer or indirectly that the employer's proffered explanation is unworthy of belief. *Combs*, 106 F.3d at 1528. If the plaintiff succeeds in meeting this burden, the disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient

15

circumstantial evidence to support a finding of discrimination and preclude summary judgment. *Id.* at 1529.

### a. The *Prima Facie* Case

In order to make out a *prima facie* Title VII case of gender based wage discrimination, the plaintiff must show that she is a female and her job was substantially similar to higher paying jobs occupied by males. *Miranda v. B & B Cash Grocery Store Inc.*, 975 F.2d 1518, 1526 (11th Cir. 1992). In the present case, Broome alleges that while she occupied the posts of ICS and Reclamation Center Manager (December of 1985 until September of 1997), she was paid less money than her male counterparts. According to Broome, this disparity in pay continued even after she was transferred to the position of Warehouse Supervisor in or around September of 1997.

### b. Legitimate Non-Discriminatory Reason

Assuming without deciding that Broome has made out a *prima facie* case of intentional discrimination, the burden shifts to SuperValu to articulate one or more "legitimate, non-discriminatory reasons for its employment action." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997). This burden is "exceedingly light," *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138 (11th Cir. 1983), and the defendant "need only offer admissible evidence sufficient to raise a genuine issue of material fact as to whether it had a legitimate reason." *Hill v. Seaboard C.L.R. Co.*, 767 F.2d 771 (11th Cir. 1985).

The legitimate, nondiscriminatory reason proffered by SuperValu to explain the pay disparity with respect to each supervisory position occupied by Broome is the company's objective pay scale -- the "Hay Point Rating System." Under the Hay Point Rating System,

16

a point value, or "Hay point," is assigned to all "exempt" positions, not the employee performing the job. (Def. Ex. 2, Brooks Dec. at ¶¶ 1, 2). Point values are determined by consideration and evaluation of the level of know-how, problem solving and accountability required for each exempt position. (*Id*. at ¶ 2). These Hay points remain constant regardless of the identity of the person performing the job, unless the level of job responsibility and accountability increases or decreases, at which time the position is subject to reevaluation. (*Id*.) Each Hay point is then assigned a dollar value, and this figure is multiplied by the relevant position's total number of Hay points resulting in that position's pay midpoint (100%). (*Id*. at ¶ 3).

An exempt employee's salary can range anywhere between 80% and 120% of his or her position's midpoint. (*Id*.). In determining a particular employee's pay within the applicable range, the employer may consider factors such as previous positions held by the employee, longevity with the company, level of experience, and pay rate from a previous employer. (Def. Ex. 9, Lux Depo. at pp. 80-81, 90-92). Each year, pursuant to the Hay Point Rating System, each employee is given a merit based increase determined by a predetermined matrix which evaluates the following criteria: (1) the proximity of the employee's current salary to the job position's midpoint; and (2) the employee's rating on the annual performance review. (Def. Ex. 2, Brooks Dec. at ¶ 4). An employee currently earning less than the midpoint established for his or her position is eligible for larger percentage increase than a similarly situated employee currently earning at a higher rate than the midpoint. (*Id*. at ¶ 4).

As discussed in further detail below, according to SuperValu, the Hay Point Rating System is a legitimate, nondiscriminatory explanation for why Broome earned less than some of her male counterparts while working as an Inventory Control Supervisor, Reclamation Center Manager, and Warehouse Supervisor.

### (1)  Inventory Control Supervisor (ICS)

Inventory Control Supervisor (ICS) is a salaried, exempt position that carries 275 Hay points. (Def. Ex. 2, Brooks Dec. at ¶ 5). Broome was promoted to the position of ICS in December of 1984. At the time Broome received her promotion, two SuperValu employees, Doyle, a female, and Mangham, a male, held identical ICS positions. (*Id*. at ¶ 6). As employees who had been performing supervisory duties since 1976 and 1977, respectively, both Mangham and Doyal received, by virtue of the Hay system, higher salaries than did Broome. (*Id*.). At least with respect to the pay disparity between herself and Mangham, Broome apparently concedes that supervisory experience, as opposed to gender, was the decisive factor. (Plf.'s Statement of Facts, ¶ 26).

As previously noted, Mangham died in a car accident in 1991, and Barker, a male, transferred from a supervisory position in the warehouse to fill the vacant ICS post. (Def. Ex. 2, Brooks Dec. at ¶ 6; Plf Ex. 1, Broome Depo. p. 161). Although Barker transferred to ICS several years after Broome was promoted to the same position, Barker's salary exceeded that of Broome's. (Def. Ex. 2, Brooks Dec. at ¶ 7). Broome attributes this disparity in salary to gender, while SuperValu maintains that it is a nondiscriminatory function of its objective Hay Point Rating System.

18

According to SuperValu, because Barker transferred from the position of Warehouse Supervisor, carrying 312 Hay points, to the position of ICS, carrying 275 Hay points, he was required to take a pay cut of approximately $2,500.00. (Def. Ex. 2, Brooks Dec. at ¶ 7). However, since his total supervisory experience exceeded that of Broome by roughly five years, he was eligible for, and received, a higher salary under the Hay point system. (Id.; Def. Ex. 10, Barker Depo. at pp. 9-13). The nondiscriminatory effect of the Hay point system, according to SuperValu, is best illustrated by the following comparison.

From 1994 to 1996, the midpoint of the salary range for ICS ranged from $32,119.00 to $33,759.00 (Def. Ex. 2, Brooks Dec. at ¶¶ 5, 7). During this time span, based on merit increases of 3.5% and 4.0%, respectively, Broome's salary increased from $31,489.00 to $34,059.00. (Id.). As a function of the midpoint, her salary progressed from 96% of the midpoint to 101% of the midpoint. (Id.). During this same time period, due to a merit increase of 3.49% each year, Barker's pay increased from $36,888.00 to $39,515.00. (Id.). As a function of the midpoint, his salary progressed from 115% of the midpoint to 117% of the midpoint. (Id.). In other words, while Barker earned more money than Broome during this time period, SuperValu maintains that this discrepancy is due to the fact that Barker had roughly six more years of supervisory experience in a position that carried a higher Hay point rating. However, since Broome was earning less than the midpoint, the Hay point system allowed her to obtain, between 1994 and 1996, a 5% raise as compared to Barker's 2% raise. (Def. Ex. 2, Brooks Dec. at ¶ 7). SuperValu also points out that, until her retirement in 1996, Doyle, a female, received the highest salary of any ICS because she had the most supervisory experience in inventory control. (Id.).

19

## (2) Reclamation Center Manager

In late 1996, Broome was informed that management of SuperValu's Reclamation Center would be transferred from the warehouse division to the inventory control division, and she would be the first ICS to perform a one-year rotation as supervisor of the Reclamation Center. (Def. Ex. 6, Cooper Depo. at pp. 28, 47-48). While performing her rotation, Broome did not receive any change in job title or pay (approximately $34,059.00 per year). (Def. Ex. 2, Brooks Dec. at ¶ 8). When the Reclamation Center was under the umbrella of the warehouse division, the center was managed by Steve Green ("Green"), a Warehouse Supervisor. (Def. Ex. 6, Woodward Depo. at p. 61). At the time the decision was made to transfer supervision of the Reclamation Center to the inventory control division, Green earned approximately $48,081.00. (Def. Ex. 2, Brooks Dec. at ¶ 9). This disparity in pay, according to Broome, is a function of her gender. SuperValu maintains that the disparity is a nondiscriminatory result of its Hay Point Rating System.

The pay for Warehouse Supervisors in 1996 ranged from $29,350.00 to $44,026.00. (Def. Ex. 2, Brooks Dec. at ¶ 9). Green, a Warehouse Supervisor with twenty-four years of supervisory experience and twenty-years experience as a Warehouse Supervisor (312 Hay points), received a salary at 131% of the Hay midpoint. (*Id*.). SuperValu does not dispute that Broome was paid substantially less money for performing duties identical to those performed by Green. Instead, SuperValu points out that Broome had roughly ten years less experience and, due to the company's decision to shift responsibility for the Reclamation Center to inventory control, she occupied a position with only 275 Hay points. (*Id*. at ¶ 10). According to SuperValu, although Broome's salary was far less than Green's, when viewed

20

in the context of the position she occupied (ICS), Broome's salary of $34,059.00 exceeded the midpoint salary range. (*Id.*). Finally, SuperValu maintains that its decision to transfer supervision of the Reclamation Center to the inventory control department, and not to evaluate the Reclamation Center position and assign that position its own Hay points, are legitimate business decisions which should not be second-guessed by either Broome or this court.

### (3) Warehouse Supervisor

In September of 1997, SuperValu decided to close the Reclamation Center and outsource that work. As a consequence, Broome was transferred to the position of Warehouse Supervisor and ultimately given a 10% increase in pay, taking her from $34,059.00 to $37,465.00. (Def. Ex. 2, Brooks Depo. at ¶ 13). Broome contends that, even with this raise in pay, she was compensated less than similarly situated male employees. (*see* Complaint at ¶ 25). Once again, SuperValu takes the position that a majority of the pay discrepancies result from a non-discriminatory application of its Hay Point Rating System.

At the outset, SuperValu points out that, of the 19 individuals who held the position of Warehouse Supervisor in 1997 and/or 1998, more than one-third made the same or less than Broome. (Def. MSJ at p. 29; Def. Ex. 2, Brooks Dec. at ¶ 14). With respect to the ten males who were paid more than Broome, SuperValu simply points out that eight of those individuals had more supervisory experience (overall experience and warehouse experience) than did Broome. According to SuperValu, this increased experience, not to mention experience in a position that carried a higher Hay point rating and broader pay scale, resulted in higher pay under the company's Hay Point Rating System.

21

SuperValu also points to the Hay point system to explain why Danny Ellison ("Ellison"), a Warehouse Supervisor since 1994, made more money than Broome. According to SuperValu, Ellison occupied the position of dispatcher, carrying 279 Hay points, since 1975. (Def. Ex. 2, Brooks Dec. at ¶ 14). Because Ellison worked for over twenty years in positions with Hay point ratings exceeding those assigned to Broome's ICS position (275 Hay points), he had more opportunity for salary increases. (*Id.*).

SuperValu does not turn to the Hay point system, however, to justify the salary of Shelly Scott ("Scott"), hired in 1998 at $40,000 (approximately 103% of the midpoint). (*Id.*) With respect to Scott, an individual with over ten years of supervisory and management experience, SuperValu maintains that offering a salary at the midpoint range was necessary to entice Scott to accept its offer of employment. Citing this court to the Eleventh Circuit's decision in *Trotter v. Board of Trustees of the University of Ala.*, 91 F.3d 1449 (11th Cir. 1996), SuperValu argues that such enticements have been recognized as a legitimate, nondiscriminatory reason for paying a qualified applicant a higher salary.

In sum, while there is evidence suggesting that Broome was paid less than some similarly situated male employees, SuperValu has successfully offered legitimate justifications for those disparities.

### c. **Plaintiff's Proof of Pretext**

Broome argues that SuperValu's articulated reasons are a mere pretext for unlawful discrimination. Broome alleges, once again, that she received unequal pay for performing the same job responsibilities as Green. She argues that SuperValu should have evaluated and assigned Hay points to the Reclamation Center job when she assumed that position.

22

She questions the supervisory experience attributed to one male supervisor, and the objectivity of the Hay Point Rating System as a whole. Finally, Broome asserts that she has "filled the record with testimony of other women who were treated differently in pay and job assignments and opportunity for promotions at SuperValu." (Plf. Response at p. 12).

These conclusory allegations of discrimination are insufficient to raise an inference of intentional discrimination. First of all, Broome does not allege, and the record does not suggest, that SuperValu manipulated Hay points in an attempt to keep Broome's salary lower than similarly situated males. To the contrary, the evidence of record suggests that the number of Hay points given to each exempt position (ICS, Warehouse Supervisor, etc.) were constant at the time Broome assumed supervisory duties and remained constant throughout her employment. Additionally, Broome's vague assertion that the Hay point system is open to subjectivity finds little support in the evidence of record. In fact, the individual who offered this opinion, a former warehouse manager, could not even explain how the Hay system works. (Plf. Ex. 2, Bowie Depo. at p. 76). Morever, the record before the court, evidencing a correlation between supervisory experience and employee wages, belies Broome's contention.

As to SuperValu's decision not to evaluate and assign Hay points to the Reclamation Center job when Broome assumed that position, the evidence suggests, and Broome does not dispute, that the Reclamation Center job has never been a "benchmark" position for the purpose of the assignment of Hay points. When the Reclamation Center was under the umbrella of the warehouse division, it was managed by Steve Green, a Warehouse Supervisor. Once supervision of the Reclamation Center was transferred to the inventory

23

control division, it was managed by Broome, an Inventory Control Supervisor. The decision to transfer management of the Reclamation Center to the inventory control department was based, at least in part, on the fact that the Reclamation Center was consistently losing money. In other words, SuperValu apparently realized they could save money by transferring responsibility of the Reclamation Center to employees occupying positions with fewer Hay points and less supervisory experience. Broome has proffered no evidence to suggest that this decision was based on anything other than SuperValu's legitimate business interests. In the absence of any evidence of a discriminatory animus, this court will not second guess such a decision. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1446, 1470 (11th Cir. 1991) (federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions").

Finally, with respect to Broome's assertions that other women were treated differently in pay, job assignments, and promotional opportunities at SuperValu, the court's own examination of the record suggests that this evidence has little, if any, probative value. For instance, while the record suggests that one Johnnie Sue Stillwell, a female SuperValu employee, was compensated less than similarly situated male employees, her claims were raised and resolved roughly fourteen years before the present action was commenced. (Plf. Ex. 4, pp. 34-57). Similarly, while Gail Wilson, SuperValu's current Human Resources Manager, testified that she was twice passed over for the position of Human Resources Director in favor of male applicants/employees, she also testified that, unlike herself, both men held college degrees. (Plf. Ex. 3, pp. 209-215). Moreover, according to Ms. Wilson's testimony, Fred Brooks, the individual who currently holds the position of Human Resources

24

Director, had roughly ten years experience as the "top HR person" in SuperValu's Quincy, Florida, division prior to applying for and accepting the very same position at Supervalu's Anniston, Alabama, office. (*Id.* at 213).

For the reasons set forth above, the court finds that no reasonable fact-finder could conclude that the explanations proffered by SuperValu were not the true reasons why Broome's salary was less than some of her male coworkers. Summary judgment will be granted in favor of SuperValu as to Broome's allegations of disparate pay.

## B. Salary Adjustment

Broome also argues that she was discriminated against when SuperValu gave three male employees upward salary adjustments in March of 1997, and declined to increase her salary. In response, SuperValu takes the position that this claim is barred by the statute of limitations and, even if the court finds the claim timely, Broome is not similarly situated to those particular employees. As discussed below, the court finds that Broome's salary adjustment claim is indeed time-barred.

In contrast to her traditional wage based claims, described above, Broome did not suffer a new violation upon receipt of pay checks that did not include a salary adjustment equivalent to that given to her male co-workers. Moreover, it cannot be said that SuperValu's March 1997 decision constitutes a single on-going violation. As the Supreme Court has explained:

> The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful. . . . The emphasis is not upon the effects of earlier employment decisions; rather it is upon whether any present violation exists.

25

*Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S. Ct. 498, 504, 66 L. Ed. 2d 431 (1980) (internal citations and quotations omitted). The court is convinced that this situation, similar to the situation presented in *Ricks,* involves the lingering effects of an alleged one time violation. *See Knight,* 19 F.3d at 584 (employees who alleged they were wrongfully denied a raise could not recover benefits because decision to deny raise was seen as a one-time event occurring outside the limitation period). For this reason, the court finds that statute of limitations began to run at the time the alleged salary adjustments were given and, therefore, expired well before the 180 day window. Accordingly, summary judgment will be granted in favor of SuperValu.[5]

## C.  Less Favorable Assignments

Broome also claims that SuperValu discriminated against her on the basis of her gender by assigning her less favorable job positions/duties. In particular, Broome maintains that, after the closing of the Reclamation Center, SuperValu: (1) changed the job title of Inventory Control Supervisor to Inventory Control Clerk in order to "replace" her with a less experienced male, and (2) refused to "bump" an ICS with less supervisory experience so that she could return to the inventory control division.

As noted above, where a plaintiff relies solely upon circumstantial evidence of intentional discrimination, the plaintiff has the initial burden of establishing a *prima facie*

---

[5] Even if this conclusion is incorrect, and Broome's salary adjustment claims are not time barred, the court is convinced that Broome could not establish a *prima facie* case of intentional discrimination because she is not similarly situated to those employees who received a raise. The evidence before the court suggests that the three individuals who received salary adjustments in March of 1997 were classified as Warehouse Supervisors. As defendant points out, a review of Broome's personnel records indicates that, at the time those raises were given, Broome occupied the position of ICS. She was promoted to Warehouse Supervisor in September of 1997, some six months after the salary adjustments were given. Summary judgment is due to be granted as to this claim.

case of disparate treatment. *McDonnell Douglas Corp.*, 411 U.S. at 802. In order to establish a *prima facie* case in the present context, a plaintiff "must show: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated male employees more favorably; and (4) she was qualified to do the job." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged employment action. *Lathem*, 172 F.3d at 793. If such a reason is produced, the plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).

With respect to Broome's first argument, i.e., that she was "replaced" by a less experienced male, the court concludes that Broome is unable to establish her *prima facie* case. As thoroughly discussed above, while Broome was acting as supervisor of the Reclamation Center, SuperValu's upper management decided to phase out supervisory jobs in the inventory control division and hire permanent clerks in their stead. These clerks, including Earl Fagen ("Fagen"), the individual who Broome contends "replaced" her, are paid on an hourly basis and have no supervisory duties. Given that Broome was offered, and ultimately accepted, a position as a Warehouse Supervisor, a position with more responsibility, increased pay and more long term opportunities, the court is hard pressed to find that Broome suffered an adverse employment action. In any event, if this conclusion is incorrect, and Broome indeed coveted an hourly, non-supervisory clerk position, there

27

is no evidence tending to suggest that she was treated less favorably than male employees/applicants because she failed to "bid" on any of the posted clerk positions.

As to Broome's novel contention that SuperValu discriminated against her by refusing to "bump" an ICS with less supervisory experience[8] so that she could return to that department, assuming she could establish her prima *facie case*, she cannot carry her ultimate burden of proving that SuperValu's proffered reasons for declining her request are mere pretext. According to SuperValu, consistent with the company's position that inventory control would be phased out, upon closing the Reclamation Center in September of 1997, Broome was offered a "promotion" to the position of Warehouse Supervisor, but was not permitted to return to her previous position in ICS. Due to the retirement of Doyle, the most senior ICS, Barker was the only remaining supervisor in the inventory control department.

SuperValu has proffered at least two legitimate non-discriminatory reasons for not "bumping" Barker and replacing him with Broome. First, according to the testimony of Woodward, SuperValu simply did not envision the "bumping" of supervisors. (Def. Ex. 6, Woodward Depo. at p. 91). Second, the company had long since decided that the post of ICS would be phased out. (*Id.* at pp. 6, 83-87). Since Barker was the last ICS on the payroll, they certainly did not want to "bump" him only to fill his vacancy with another SuperValu employee. Consistent with this position, after Barker was terminated in 1997, neither his ICS position nor any other ICS position was ever filled by SuperValu. (*Id.* at p. 157). Given that

---

[8] As previously noted, while Barker has less experience than Broome in inventory control, he enjoyed more overall supervisory experience in a position that carried more Hay points.

Broome has not even attempted to discredit SuperValu's explanations, no reasonable fact-finder could conclude that those reasons are not the true reasons why Broome was not allowed to resume a position as ICS. Accordingly, summary judgment will be granted in favor of SuperValu as to Broome's allegations of less favorable treatment.

## D. Retaliation and Constructive Discharge

SuperValu also maintains that summary judgment is due to be granted on Broome's Title VII retaliation claims. In her second amended complaint, Broome alleges that SuperValu rotated her work schedule from days to evenings in retaliation for lodging a claim of discrimination with the EEOC. Broome further maintains that, due to her child care arrangements and medical condition, the rotation ultimately resulted in her constructive discharge.

Title VII protects employees from retaliation by their employer for making a complaint of discrimination.[7] In order to make out a prima facie case of retaliation, Broome must prove that: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).

_____

[7] The retaliation provision of Title VII states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. 2000e-3(a).

29

It is undisputed that Broome participated in a protected activity; she complained to SuperValu about alleged discrimination and filed a discrimination charge with the EEOC. With respect to the second prong, Broome contends that she suffered an adverse employment action in that she was rotated to the night shift. "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Id.* (citations and quotation marks omitted). "Conduct that falls short of an ultimate employment decision must meet 'some threshold level of substantiality . . . to be cognizable under the anti-retaliation clause'" of Title VII. *Id.* (quoting *Wideman v. Wal-Mart Stores,* 141 F.3d 1453, 1456 (11th Cir. 1998)). In other words, an "employment action . . . is not adverse merely because the employee dislikes it or disagrees with it." *Doe v. Dekalb County School Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting with approval *Perryman v. West*, 949 F. Supp. 815, 819 (M.D. Ala. 1996).

In the present case, following SuperValu's announcement of a shift rotation, Broome's physician, Dr. Ann Groover, sent SuperValu a letter which stated:

> I have recommended to Ms. Broome that a return to work in a second shift position would be inadvisable at this time in terms of her emotional health. It is my recommendation that if her employer is unwilling to keep her on her first shift position where she has been for many years that she would need to look for employment elsewhere. I believe that a move to a second shift position would be severely detrimental to her emotional stability.

30

(Def. Ex. 11, Bates # D-1151, letter of Dr. Ann Grover - March 5, 1999). Four days after receipt of Dr. Groover's letter, SuperValu, through Fred Brooks, requested further information regarding Broome's need for accommodations. SuperValu's responsive letter reads, in pertinent part, as follows:

> We are requesting additional information about your March 5 letter. Specifically, is your restriction to first shift duty based upon some understanding about different stress levels in the different shifts? Are there emotional demands related to second shift work which you understand not to arise on the first shift? Would it be helpful for us to provide you with a comparison of the job duties of the two shifts?
>
> Under these circumstances, SUPERVALU normally requests a doctor to review the job description for her patient and fill out a Job Demand Profile with specific physical restrictions. We enclose copies of these here. Please note that the warehouse supervisor's job description is the same for every shift, and that in our experience there are no greater demands placed upon a supervisor in any one shift over any other. Would you please consider the enclosed, fill out the profile, and return it to us as soon as possible.

(Def. Ex. 11, Bates # D-1142, letter of Fred Books - March 9, 1999). Dr. Groover apparently declined to respond to SuperValu's follow up letter and, on March 15, 1999, before ever working on the night shift, Broome resigned. (Def. Ex. 11, Bates # D-1130).

The court finds that a potential, routine rotation to the night shift does not rise to the level of an "adverse employment action" necessary to make out a *prima facie* case of retaliation. Although, in certain circumstances, singling out an employee for less desirable shifts may rise to the level of adverse action, this is not such a case. The evidence before the court suggests that, because the warehouse runs 24 hours a day, shift rotation is part of a Warehouse Supervisor's job description. Broome was not the only supervisor whose shift

31

changed. In fact, the evidence suggests that all but two supervisors were rotated or otherwise had changes in their shifts. (Plf. Ex. 1, Broome Depo., pp. 103-04, 106-108). Although Broome may have preferred not to work the night shift, given that her duties, responsibilities and number of hours would have remained unchanged, the court cannot conclude that such a shift change rises to the level of an adverse employment action. Accordingly, summary judgment will be granted in favor of SuperValu on Broome's retaliation claim.

To the extent Broome claims that a routine rotation to the night shift is sufficient to support a claim of constructive discharge, the court finds her argument unavailing. *See Meeks v. Computer Assocs. Int's,* 15 F.3d 1013 (11th Cir. 1994) (constructive discharge may form the basis of a Title VII retaliation claim). In order to prove constructive discharge, an employee "must demonstrate that [her] working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign." *Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir. 1993); *Steele v. Offshore Shipbuilding Inc.,* 867, F.2d 1311, 1317 (11th Cir. 1989). A reasonable employee is one who does not "assume the worst" or "jump to conclusions too fast." *Garner v. Wal-Mart Stores,* 807 F.2d 1536, 1539 (11th Cir. 1987). Moreover, the Eleventh Circuit has determined that a constructive discharge will generally not be found to have occurred where the plaintiff does not allow sufficient time for the employer to remedy the situation. *See Kilgore v. Thompson & Brock Mgmt., Inc.,* 93 F.3d 752, 754 (11th Cir. 1996).

In support of her constructive discharge claim, Broome relies on much of the same evidence proffered in support of her retaliation claim, and emphasizes that a rotation to the

32

night shift would interfere with her child care arrangements and would detrimentally impact her emotional stability. The court finds these arguments unpersuasive. First, as described above, shift rotations are a normal, routine occurrence for Warehouse Supervisors such as Broome. Therefore, similar to many other work schedules in today's society, a Warehouse Supervisor's schedule may interfere with his or her child care arrangements. Such a predicament, however, hardly rises to the level of a constructive discharge claim. Second, as to concerns about her emotional health, the court emphasizes that Broome submitted her letter of resignation before her shift rotation materialized and during the course of SuperValu's attempts to clarify her need for an accommodation. SuperValu argues, and the court agrees, that Broome fits the profile of an employee who simply assumed the worst and jumped to conclusions too fast. Accordingly, SuperValu's motion for summary judgment will be granted as to Broome's constructive discharge claim.[8]

## VI. Conclusion

The court will enter an appropriate order in conformity with this memorandum of opinion denying Broome's motion to strike and granting SuperValu's motion for summary judgment in all respects.

---

[8] Although not raised in the Complaint, in her responsive submission, Broome apparently alleges that both her transfer to the Reclamation Center and her promotion to Warehouse Supervisor rise to the level of constructive discharge. Viewed in a light most favorable to Broome, the facts are simply insufficient to demonstrate objectively intolerable working conditions. Even assuming her working conditions were objectively intolerable, Broome has failed to proffer any evidence tending to suggest that her transfers/promotions were motivated by her gender. Summary judgment will also be granted on these claims.

Done, this 23rd of March, 2001.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE